UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FELICIA HELTON,

                              Plaintiff,

        v.

AVRIO GROUP SURVEILLANCE SOLUTIONS, INC.,
and JOHNSON CONTROLS, INC.,

                              Defendants.
_____

JOHNSON CONTROLS, INC.,

                              Cross Claimant,

        v.

AVRIO GROUP SURVEILLANCE SOLUTIONS, INC.,

                              Cross Defendant.
_____

CITY OF BUFFALO,

                              Plaintiff,

        v.

JOHNSON CONTROLS, INC., and
AVRIO GROUP SURVEILLANCE SOLUTIONS, INC.,

                              Defendants.
_____

JOHNSON CONTROLS, INC.,

                              Cross Claimant,

        v.

AVRIO GROUP SURVEILLANCE SOLUTIONS, INC.,

                              Cross Defendant.
_____

REPORT
and
RECOMMENDATION

09-CV-00494A(F)

11-CV-00775A(F)

APPEARANCES:  CELLINO & BARNES, P.C.
Attorneys for Plaintiff
MICHAEL J. COOPER, of Counsel
451 Grider Street
Buffalo, New York 14215

TIMOTHY A. BALL
CORPORATION COUNSEL, CITY OF BUFFALO
Attorneys for Plaintiff City of Buffalo
DAVID M. LEE, Assistant Corporation Counsel, of Counsel
1100 City Hall
65 Niagara Square
Buffalo, New York 14202

HAGERTY & BRADY
Attorneys for Defendant and Cross Defendant
  Avrio Group Surveillance Solutions, Inc.
EDWIN P. HUNTER and
THOMAS V. HAGERTY, of Counsel
69 Delaware Avenue
Buffalo, New York 14202

GOLDBERG SEGALLA LLP
Attorneys for Defendant and Cross Claimant
  Johnson Controls, Inc.
JOHN P. FREEDENBERG, of Counsel
665 Main Street
Suite 400
Buffalo, New York 14203

REED SMITH LLP
Attorneys for Defendant and Cross Claimant
  Johnson Controls, Inc.
CASEY L. WESTOVER, of Counsel
10 South Wacker Drive
40th Floor
Chicago, Illinois, 60606

## **JURISDICTION**

These cases were referred to the undersigned by Honorable Richard J. Arcara

on June 10, 2009 (09-CV-00494) and June 22, 2011 (11-CV-00775), for all pretrial

matters including report and recommendation on dispositive motions.[1]  The matter is presently before the undersigned on motions filed by Defendant Johnson Controls, Inc., on November 29, 2012 for summary judgment (09-CV-00494, Doc. No. 70; 11-CV-00775, Doc. No. 28), and on November 30, 2012, for partial summary judgment (09-CV-00494, Doc. No. 72; 11-CV-00775, Doc. No. 29), and by Defendant Avrio Group Surveillance Solutions, Inc., on November 30, 2012, for summary judgment (09-CV-00494, Doc. No. 71).

## BACKGROUND

On March 18, 2009, Plaintiff Felicia Helton ("Helton"), filed a complaint in New York Supreme Court, Erie County, alleging she suffered personal injuries caused by the negligence of Defendants Avrio Group Surveillance Solutions, Inc. ("Avrio"), a Maryland corporation, and Johnson Controls, Inc. ("Johnson Controls"), a Wisconsin corporation (together, "Defendants").  Helton specifically alleges that on August 3, 2008, while working as a police officer with the City of Buffalo Department of Police ("Buffalo Police") in the Buffalo Police video surveillance monitoring room ("surveillance command room"), a video monitor mounted to a wall at the back of the cubicle workstation intended for mounting brackets ("slat wall")[2] at which Helton was seated, slid off the brackets on which it was mounted ("monitor mount" or "mounting brackets") as Helton attempted to adjust it, falling on Plaintiff's left hand and pinning it to the

---

[1]  Although these cases have not been formally consolidated, they arise from the same set of facts and the motions filed by Johnson Controls, Inc. in each case are essentially identical.  As such, all motions filed in both cases are addressed in one Report and Recommendation in the interest of judicial economy and completeness.

[2]  The rear wall of the cubicle work station is referred to in the record as both a "slat wall" and a "slot wall," and is comprised of a series of slats permitting lamps, monitors, and other equipment to be mounted on brackets affixed to the slats in the wall.

workstation's desk, causing serious injuries.  Defendant Johnson Controls filed an

answer on April 26, 2009 and, on May 26, 2009, removed the action to this court (09-

CV-00494A(F), "Helton Action"), alleging diversity of citizenship under 28 U.S.C. § 1332

as the basis for subject matter jurisdiction.  Avrio's answer was filed on June 9, 2009

(Helton Action, Doc. No. 3).

On March 28, 2011, Helton filed an Amended Complaint (Doc. No. 32) ("Helton

Action, Amended Complaint"). [3]  On May 11, 2010, Johnson filed an amended answer

(Helton Action, Doc. No. 18), asserting against Avrio crossclaims for breach of contract

and contribution and indemnification.  Avrio's answer to the crossclaims was filed on

November 9, 2010 (Helton Action, Doc. No. 20).

On July 29, 2011, Plaintiff City of Buffalo ("the City"), filed an action in New York

Supreme Court, Erie County, seeking to recover from Defendants Avrio and Johnson

Controls[4] damages for Helton's medical care and treatment and disability payments

based on Defendants' alleged negligence in installing the video monitor that fell on

Helton's left hand.  On September 15, 2011, Johnson Controls removed the action to

this court (11-CV-00775A(F), "City Action"), alleging diversity of citizenship under 28

U.S.C. § 1332 as the basis for subject matter jurisdiction.[5]  On September 21, 2011,

---

[3] In addition to Johnson Controls and Avrio, the Amended Complaint filed in the Helton Action on March 28, 2011, also named as a defendant Wright-Line LLC, which was dismissed by stipulation of all parties on November 17, 2012 (Helton Action, Doc. No. 69).
[4] Also named as a defendant in the City Action was Wright Line LLC , which was dismissed by stipulation of all parties on November 17, 2012 (City Action, Doc. No. 27).
[5] Although both actions were removed by Johnson Controls more than 30 days after receipt of service of the complaint, the removals appear timely as, with regard to the Helton Action, filed within 30 days of Johnson Controls' receipt, on May 18, 2009, of Plaintiff's response to Johnson Control's demand for damages pursuant to N.Y. C.P.L.R. 3017(c), and, with regard to the City Action, filed within 30 days of receipt on August 29, 2011, of service of the summons and Complaint.  Nor did Avrio properly join in the removal of the Helton Action, Johnson Control's bare assertion that Avrio consented to the removal being insufficient. *See Stewart v. Atwood*, 834 F.Supp.2d 171, 177 n. 5 (W.D.N.Y. 2012) ("Each named defendant who is served must timely file with the court 'some form of unambiguous written evidence of consent to removal.'" (quoting *Piacente v. State University of New York at Buffalo*, 362 F.Supp.2d 383,

Johnson Controls filed an answer (City Action, Doc. No. 5), asserting against Avrio crossclaims for breach of contract and contribution and indemnification. Avrio's answer to the Complaint and the crossclaims was filed on October 28, 2011 (City Action, Doc. No. 10).

On November 29, 2012, Johnson Controls filed the same motion and supporting papers in the Helton Action and the City Action seeking summary judgment against each action's respective Plaintiff, *i.e.*, Helton (Helton Action, Doc. No. 70) and the City (City Action, Doc. No. Doc. No. 28) ("Johnson Controls' Summary Judgment Motion"), supported by the attached Affidavit of Casey L. Westover, Esq. (Helton Action, Doc. No. 70-1; City Action, Doc. No. 28-1) ("Westover Affidavit – Summary Judgment"), Johnson Controls, Inc.'s L.R. Civ. P. 56 Statement of Material Facts in Support of Its Motion for Summary Judgment (Helton Action, Doc. No. 70-2; City Action Doc. No. 28-2) ("Johnson Controls' Statement of Facts"), Defendant Johnson Controls, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment Against Plaintiffs Felicia Helton and the City of Buffalo (Helton Action, Doc. No. 70-3; City Action, Doc. No. 28-3) ("Johnson Controls' Memorandum – Summary Judgment"), and exhibits A through Y (Helton Action, Docs. Nos. 70-5 through 70-31; City Action, Docs. Nos. 28-5 through 28-31) ("Johnson Controls' Exh(s). ___").

On November 30, 2012, Johnson Controls filed the same motion and supporting papers in both actions seeking partial summary judgment on its breach of contract

---

384 n. 3 (W.D.N.Y. 2004) (internal quotation marks and citation omitted)). Nevertheless, Plaintiff did not move to remand and the time in which to remand, absent the lack of a valid jurisdictional basis, has now expired. *Okoi v. El Al Israel Airlines*, 378 Fed.Appx. 9, 12 (2d Cir. 2010) ("a party opposing removal on a ground other than the lack of federal jurisdiction must move to remand within thirty days after the filing of the notice of removal or the objection is waived"). Avrio did, however, specifically join in the removal of the City Action. Notice of Removal, City Action, Doc. No. 1, Exh. C.

cross-claim against Avrio (Helton Action, Doc. No. 72; City Action, Doc. No. 29) ("Johnson Controls' Partial Summary Judgment Motion"), supported by the attached Affidavit of Casey L. Westover, Esq. (Helton Action, Doc. No. 72-1; City Action, Doc. No. 29-1) (Westover Affidavit – Partial Summary Judgment"), Johnson Controls, Inc.'s L.R. Civ. P. 56 Statement of Material Facts in Support of Its Motions for Summary Judgment (Helton Action, Doc. No. 72-2; City Action, Doc. No. 29-2) ("Johnson Controls' Statement of Facts"),[6] and Defendant Johnson Controls, Inc.'s Memorandum of Law in Support of Its Partial Motion for Summary Judgment on Liability Only on Its Breach of Contract Cross-Claim Against Avrio Group Surveillance Solutions, Inc. For Failure to Procure Required Insurance (Helton Action, Doc. No. 72-3; City Action, Doc. No. 29-3) ("Johnson Controls' Memorandum – Partial Summary Judgment").  Johnson Controls also incorporates by reference the same exhibits Johnson Controls filed in support of its Summary Judgment Motion in support of its Partial Summary Judgment Motion.  Westover Affidavit – Partial Summary Judgment ¶ 4.

On November 30, 2012, Avrio filed a motion for summary judgment against Helton in the Helton Action (Helton Action, Doc. No. 71) ("Avrio's Motion"), supported by the attached Statement of Material Facts (Helton Action, Doc. No. 71-1) ("Avrio's Statement of Facts"), the Affidavit of Edwin P. Hunter, Esq. (Helton Action, Doc. No. 71-2) ("Hunter Affidavit"), a Memorandum of Law (Helton Action, Doc. No. 71-3) ("Avrio's Memorandum"), and exhibits A though L (Helton Action, Docs. Nos. 71-4 through 71-15) ("Avrio Exh(s). __").

---

[6] The court notes Johnson Controls' Statement of Facts filed in support of Johnson Controls' Partial Summary Judgment Motion is identical to Johnson Controls' Statement of Facts filed in support of Johnson Controls' Summary Judgment Motion and, accordingly, refers to the documents by the same name.

On January 30, 2013, Helton filed in opposition to Johnson Controls' Summary Judgment Motion and Avrio's Motion the Responding Affidavit of Michael J. Cooper, Esq. (Helton Action, Doc. No. 74) ("Cooper Response Affidavit").[7] On January 31, 2013, the City filed in opposition to Johnson Controls' Summary Judgment Motion the Attorney Affidavit of Assistant Corporation Counsel David M. Lee (City Action, Doc. No. 31) ("Lee Affidavit"), with attached exhibits ("Lee Affidavit Exh(s). __"). In further support of its motion for summary judgment against Helton, Avrio filed on February 15, 2013, the Reply Memorandum of Law (Helton Action, Doc. No. 75) ("Avrio's Reply"). Also on February 15, 2013, Johnson Controls filed the same documents in both actions in further support of its motions for summary judgment and partial summary judgment, namely Defendant Johnson Controls, Inc.'s Reply Memorandum of Law in Support of Its Motion for Summary Judgment Against Plaintiff's Felicia Hilton and the City of Buffalo (Helton Action, Doc. No. 76; City Action, Doc. No. 32) ("Johnson Controls' Reply – Summary Judgment"), and Defendant Johnson Controls, Inc.'s Reply Memorandum of Law in Support of Its Partial Motion for Summary Judgment on Liability Only on Its Breach of Contract Cross-Claim Against Avrio Group Surveillance Solutions, Inc. for Failure to Procure Required Insurance (Helton Action, Doc. No. 77; City Action, Doc. No. 33) ("Johnson Controls' Reply – Partial Summary Judgment").

---

[7] The court notes there are exhibits attached to the courtesy copy of the Cooper Response Affidavit delivered to the undersigned, but such exhibits were not electronically filed and, as such, are not part of the record and cannot be considered in deciding the pending summary judgment motions. *See Cohen v. Gerson Lehrman Group, Inc.*, 2011 WL 4336679, at * 2 (S.D.N.Y. Sept. 15, 2011). Only one such exhibit, volume 2 of Helton's deposition, denominated as exhibit A, is not filed elsewhere in the record and, because no other party references such deposition, it cannot be considered. *See Mediterranean Shipping Co., (USA) Inc. v. Worldwide Freight Services, Inc.*, 2012 WL 3740683, at *1, n. 1 (S.D.N.Y. Aug. 29, 2012) (considering on motion for summary judgment declaration never filed on court's docket, where opposing party referenced such declaration in opposing summary judgment and a courtesy copy of the declaration was provided to the judge). Portions of another exhibit, the deposition of Buffalo Police Lieutenant Lewis Ferrentino, denominated as exhibit B, are filed as Avrio Exh. D, and such portions may be considered. The remaining exhibits are filed elsewhere in the record either as exhibits of Johnson Controls or the City, and may be considered.

On March 12, 2013, Helton filed Plaintiff's Response and Counterstatement to Defendant's Rule 56 Statement of Undisputed Material Facts (Helton Action, Doc. No. 79) ("Helton's Counterstatement"), Plaintiff's Response to Defendants' Rule 56 Statement of Facts and Motion for Summary Judgment (Helton Action, Doc. No. 80) ("Helton's Response"), and the Reply Memorandum of Law (Helton Action, Doc. No. 81) ("Helton's Memorandum").

On May 15, 2013, the City filed an Amended Response to Johnson Controls, Inc.'s Statement of Material Facts (City Action, Doc. No. 37) ("City's Response"). On May 22, 2013, Avrio filed the Responding Affidavit of Edwin P. Hunter, Esq. to Plaintiff's Response and Counterstatement, Reply Memorandum of Law and Affidavit of Michael J. Cooper, Esq., Filed March 12, 2013 (Helton Action, Doc. No. 92) ("Hunter Response Affidavit"). On June 5, 2013, Johnson Controls filed the same document in both actions, to wit, Defendant Johnson Controls, Inc.'s Reply Memorandum of Law in Support of Its Motion for Summary Judgment Against Plaintiffs Felicia Helton and the City of Buffalo (Helton Action, Doc. No. 94; City Action, Doc. No. 39) ("Johnson Controls' Sur-Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendant Johnson Controls' Motions for Summary Judgment should be GRANTED; Defendant Johnson Controls' Motions for Partial Summary Judgment should be GRANTED; Defendant Avrio's Motion for Summary Judgment should be DENIED.

## **FACTS**[8]

Plaintiff Felicia Helton ("Helton"), commenced employment as a police officer with the City of Buffalo Police Department ("Police Department") in 1988. On August 3, 2008, Helton was working at a light duty assignment in the Police Department's surveillance command room, located at the Police Department's headquarters in downtown Buffalo. Helton had been assigned to work in the surveillance command room since March 2008, when the surveillance command room first became operational.

Preparations for the Police Department's video surveillance monitoring project ("video surveillance project"), began in November 2007, when Johnson Controls and the City entered into the Citywide Surveillance Camera Project Contract 93000079 ("Contract"),[9] requiring, *inter alia*, Johnson Controls to provide " a turnkey solution" for 60 "continuously" operating surveillance cameras to be located throughout the City, along with equipment to transmit video captured by the cameras, video storage devices, and related software, as well as design and construction of the surveillance command room, from which the video surveillance cameras were controlled, to be located at the Police Department's Headquarters. Contract ¶¶ 1-2. The surveillance command room was to include "video surveillance monitors, furniture, workstations and software . . . . " *Id.* ¶ 2. Johnson Controls also agreed to "defend, indemnify, and hold harmless" the City for any claims arising out of the negligence of Johnson Controls or its subcontractors, *id.* ¶ 13, to maintain Commercial General Liability Insurance ("CGLI"),

---

[8] Taken from the pleadings and motion papers filed in this action.
[9] A copy of the Contract is filed as Johnson Controls' Exh. T (Helton Action, Doc. No. 70-26).

including Products and Completed Operations coverage in the aggregate sum of $ 3 million, *id.* ¶ 14, and to name the City as an additional insured on such policy. *Id.*

Johnson Controls, through Subcontract 2476622[10] and Subcontract 2476628[11] ("Subcontracts"), both dated November 29, 2007, and largely identical, subcontracted most of the work for the surveillance command room to Avrio. According to the Subcontracts,[12] Avrio was to "provide a turnkey solution" for the video surveillance cameras, video transmission equipment, video storage, video servers, and related software, Subcontracts ¶ 1, and to "provide video surveillance monitors, furniture, workstations and software for a video surveillance [command] [13] room in accordance with agreed design at the Buffalo Police Headquarters." Subcontracts ¶ 3. Section § 7.5 of the Subcontracts, bearing the heading "Independent Contractor," provides Avrio would work on the video surveillance project as an independent contractor, rather than as Johnson Controls' agent, and Johnson Controls did not retain

> any right to exercise any control over or to direct in any respect the conduct or management of this business or operations of Subcontractor. The entire control and direction of such business and operations shall be and shall remain in Subcontract. Neither Subcontractor nor any person performing any duties or engaged in any work on behalf of subcontractor shall be deemed an employee or agent of Contractor.

Subcontracts ¶ 7.5.

Avrio was also required to obtain and maintain a Commercial General Liability Insurance policy ("CGLI policy") with $ 3 million per occurrence and general aggregate limits, and to name Johnson Controls as an additional insured. Subcontracts ¶¶ 5.1.

---

[10] Johnson Controls' Exh. U (Helton Action, Doc. No. 70-27).
[11] Johnson Controls' Exh. V (Helton Action, Doc. No. 70-28).
[12] Because the copies of the Subcontracts filed as Johnson Controls' Exhs. U and V are illegible, the court relies on the relevant text of the Subcontracts as quoted by the parties, which has not been disputed.
[13] Unless otherwise indicated, all bracketed text is added.

Avrio, however, did not name Johnson Controls as an additional insured on its CGLI policy, and only obtained insurance coverage of $ 1 million bodily injury coverage per occurrence, with a $ 2 million aggregate.

As of August 3, 2008, when Plaintiff sustained her alleged injuries, the surveillance command room contained five workstation cubicles, each workstation consisting of a cubicle-style desk with a slat wall on the back of the cubicle, three video monitors, a computer, and a telephone. The three video monitors included a 21-inch Dell, a 19-inch Dell, and a 24-inch NEC touchscreen monitor ("the NEC monitor"). The NEC monitor is the one that fell on Helton's left hand on August 3, 2008. The two Dell video monitors sat on bases on the desktop, one on the right side of the desktop, and the other on the left side of the desktop. The NEC touchscreen was the heaviest of the three monitors, weighing 21.4 lbs., but was nevertheless specified for wall mounting, and was mounted to the back of the cubicle slat wall on a mounting bracket that could be manually adjusted to change the NEC monitor's position. The mounting bracket, which was specified as able to accommodate a monitor weighing up to 40 lbs., consisted of a plate that attached to the cubicle's slat wall. The next part of the mounting bracket was a "slide rail" which attached vertically to the plate. The "head assembly" was a disc-shaped object which was attached to the back of the NEC monitor with screws, and slid onto the slide rail allowing for the NEC monitor to be adjusted to the left or right, and tilted forward and backward. Screws attached at both ends of the slide rail, referred to as "endlocks," ensured the NEC monitor did not slide off either end of the slide rail when adjusted.

Helton does not recall any changes to the equipment at each workstation between March 2008, when Helton commenced working in the surveillance command room, and August 3, 2008, when Helton sustained the predicate injury to these actions. In contrast, Avrio maintains that when the surveillance command room first became operational in March 2008, each workstation had only two video monitors, a Dell monitor and the NEC monitor, each of which sat on stands located on the workstation desktop, and that the NEC monitor was mounted onto the mounting bracket only a couple of weeks prior to the incident to make room on the cubicle's desktop for the second DELL monitor. Mounting the NEC monitor to the cubicle's slat wall allowed for more desk space at the work station.

On August 2, 2008, Helton commenced the night shift in the surveillance command room, which typically commenced at 8:00 P.M. and concluded the following day at 6:00 A.M. Helton worked at one workstation until about 1:30 A.M. on August 3, 2008, when she moved to another workstation, where Helton had to manually adjust the NEC monitor to accommodate the difference in height between Helton and the police officer who sat at the workstation immediately before Helton's shift. According to Helton, while she was manually adjusting the NEC monitor to tilt the monitor forward, the NEC monitor slid off the slide rail, and fell on her left hand, pinning the hand to the desktop. Helton had, years earlier, sustained an injury to her right hand, which had weakened her right hand, rendering Helton unable to free her left hand from under the NEC monitor. As a result, the NEC monitor lay on Helton's left hand for some time before another officer, Gwendolyn Williams ("Williams"), came to Helton's aid and lifted the NEC monitor from Helton's hand. Upon being advised that a monitor had fallen on

Helton's hand, Lieutenant Ferrentino entered the surveillance command room, observed the NEC monitor lying on the desk, and picked up the NEC monitor, commenting on the NEC monitor's weight.  Lieutenant Ferrentino also observed the head assembly was still attached to the back of the NEC monitor, and the remaining portion of the mounting bracket was attached to the cubicle's slat wall.  Helton maintains the endlock screws either were never installed on the slide rail, or were improperly installed, allowing for the head assembly, with the attached NEC monitor, to slide off the slide rail when Helton attempted to adjust the NEC monitor.

After the NEC monitor was lifted off her hand, Helton was in pain and she observed her hand was swelling despite ice applications.  Williams drove Helton to Erie County Medical Center for treatment, but the inflammation in Helton's hand prevented X-rays from being taken.  When the swelling subsided and Helton's hand was X-rayed, no abnormalities were observed.  Nevertheless, Helton has, since her August 3, 2008 injury, continued to complain of pain, and has not returned to work.  Helton's diagnosis is reflex sympathetic dystrophy ("RSD"), also known as complex regional pain syndrome ("CRPS").  Helton seeks damages in this action for total permanent disability, although her treating pain management doctor, Ashraf Henry, M.D. ("Dr. Henry"), has indicated Helton possibly could perform "light duty" work in another setting.

In connection with the Helton Action, licensed professional engineer Cheyenne Saunders ("Saunders"), conducted an examination of the monitor mount from which the NEC monitor fell, and the NEC monitor, and also reviewed the Buffalo Police accident report, the monitor mount's manufacturer's specifications, and the installation

instructions.  Saunders Dep. Tr. at 45-55.[14]  Saunders observed that the end locks

which were intended to prevent the assembly head with the attached monitor from

sliding off the slide rail were not installed on the slide rail, the assembly head was still

attached to the NEC monitor, and the mounting brackets were still attached to the

workstation cubicle's slat wall.  *Id.* at 90.  The NEC monitor weighed 21.4 lbs., *id.* at 84,

which was within the maximum weight capacity of 40 lbs. specified for the monitor

mount.  Id. at 87.  Nor did Saunders observe any "witness pattern," *i.e.*, marks made

from the installation of the end lock bolts, on the slide rail, *id.* at 64, 97, which was

consistent with Saunders' conclusion that it was unlikely the end locks were ever

installed, and the failure to install the end lock permitted the assembly head, with the

NEC monitor attached, to slide off the slide rail when Helton attempted to adjust the

NEC monitor's position.  *Id.* at 58-59, 100.


## DISCUSSION

**1.    Summary Judgment**

Johnson Controls moves for summary judgment in both the Helton Action and

the City Action, seeking to dismiss in their entirety all claims by Helton and the City, and

for partial summary judgment in both the Helton Action and the City Action on Johnson

Controls' cross-claim alleging Avrio breached its contractual agreement to obtain the

required insurance.  Avrio moves for summary judgment in the Helton Action seeking to

dismiss all of Helton's claims in their entirety.

---

[14]   References to "Saunders Dep. Tr." are to the pages of the transcript of Saunders' deposition, filed in three parts as Johnson Controls' Exh. L, M and N (Helton Action, Docs. Nos. 70-16, 17 and 18).

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing as to the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996).

## 2.      Negligence

Preliminarily, the court observes that "[a] federal court sitting in diversity applies

the choice of law rules of the forum state."  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545

(2d Cir. 1999) (citing *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941)).  In a

tort action, New York applies the law of the state with the most significant interest in the

litigation, which is generally the place of the tort.  *Czochanski v. Tishman Speyer*

*Properties, Ltd.*, 45 Fed.Appx. 45, 46 (2d Cir. 2002) (citing *Lee*, 166 F.3d at 545).  In the

instant case, Helton's alleged injury occurred in New York, no party has raised any

choice-of-law questions, and papers submitted by all parties apply New York

substantive law.  Accordingly, New York tort law applies in this diversity action.

Under New York law, an action for negligence requires a plaintiff to prove three

elements: "'(1) the existence of a duty on defendant's party as to plaintiff; (2) a breach of

this duty; and (3) injury to the plaintiff as a result thereof.'"  *Alfaro v. Wal-Mart Stores,*

*Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 424

N.E.2d 531, 535 (N.Y. 1981)).  To defeat a motion for summary judgment in an action for negligence, the plaintiff must introduce adequate evidence on each element of negligence sufficient to support a favorable jury verdict.  *Basso v. Miller*, 352 N.E.2d 868, 873 (N.Y. 1976).   "[W]here proof of any essential element falls short the case should go no further."  *Id.*

As stated, both Johnson Controls and Avrio have moved for summary judgment seeking to dismiss in their entirety the negligence claims filed by both Helton and the City in their respective actions.[15]  Johnson Controls maintains nothing in the record, including any provision in the Contract between Johnson Controls and the City, establishes any Johnson Controls' employee was involved in installing the end locks on the mounting bracket or the NEC monitor that fell on Helton's hand and, as such, neither Helton nor the City can establish Johnson Controls breached any duty to Plaintiff so as to hold Johnson Controls responsible for Helton's injuries or the resulting damages suffered by Helton and the City.  Johnson Controls' Memorandum – Summary Judgment at 1.  Avrio seeks summary judgment only in the Helton Action, asserting Helton cannot establish Avrio was, in fact, responsible for installing, or took any part in installing the mounting bracket from which the NEC monitor fell onto Helton's hand, resulting in injuries as Helton alleges.  Avrio's Memorandum at 3-12.  In opposition to summary judgment, Helton argues summary judgment is precluded by material issues of fact as to which defendant decided to mount the NEC monitor on the cubicle slat wall and which defendant actually installed the NEC monitor that fell on Helton's hand.

---

[15] Although Johnson Controls filed for summary judgment against Helton in the Helton Action and against the City in the City Action, Avrio filed for summary judgment only against Helton in the Helton Action. Nevertheless, if Avrio's motion for summary judgment against Helton in the Helton Action is granted, then the City's claims against Avrio, which are derivative of Helton's claims against Avrio, would be moot.

Cooper Response Affidavit ¶¶ 2, 17-24. The City argues in opposition to summary judgment that there are issues of fact for the jury to resolve as to which defendant installed the NEC monitor that fell onto Helton's hand, as well as which defendant was involved in the selection, purchasing, and installation of the mounting bracket to which the NEC monitor was attached. Lee Affidavit ¶¶ 7, 16.

In further support of summary judgment against Helton and the City, Johnson Controls argues the record is devoid of any evidence suggesting Johnson Controls installed the NEC monitor, or was involved in the installation, and that Helton admits, and Avrio does not deny, that Avrio was responsible for the NEC monitor's installation. Johnson Controls' Reply – Summary Judgment at 1. Avrio does not deny acting as an independent contractor under the Subcontracts, yet argues in further support of summary judgment against Helton that Helton, in responding in opposition to Avrio's motion, has misrepresented the deposition testimony of various witnesses in an attempt to confuse the court by creating issues that do not exist. Avrio's Reply at 1.

Helton argues in further opposition to summary judgment there exist material issues of fact as to whether any Johnson Controls employee was involved in mounting the NEC monitor to the cubicle slat wall, including that Johnson Controls employee James Carriagher ("Carriagher"), advised Buffalo Police Captain Mark Makowski ("Capt. Makowski"), who served as project manager for the video surveillance project, that some of the monitors would be mounted on the cubicle slat walls to free up work space on each workstations' desktop, and that statements by Avrio employees establish the design and construction of the workstations was a "team effort." Helton's Memorandum at 9-10. According to Helton, neither Defendant has submitted any evidence in

admissible form establishing an entitlement to summary judgment. Helton's Memorandum at 13-14. In sur-reply, Johnson Controls argues nothing in the record establishes Johnson Controls was at all involved with mounting the NEC monitor to the cubicle slat wall and, as such, Johnson Controls cannot be held responsible for any negligent installation, Johnson Controls' Sur-Reply at 1; and Avrio asserts Helton relies only on conclusory assertions in opposing summary judgment with nothing in the record conclusively establishing Avrio installed the NEC monitor that fell on Helton's hand. Hunter Response Affidavit ¶¶ 40-47.

Johnson Controls argues that although fact discovery has closed, neither Helton nor the City has produced any evidence connecting Johnson Controls to the allegedly negligent installation of the NEC monitor onto the mounting bracket, and the evidence establishes that others were responsible for such installation. Johnson Controls' Memorandum – Summary Judgment, at 8-12. According to Johnson Controls, Helton and the City have failed to investigate the possibility that the NEC monitor was installed onto the mounting bracket, or that the mounting bracket was modified by someone other than Johnson Controls, including by someone within the Buffalo Police Department who would have had access to the surveillance command room and the monitor mount, but whom Helton, as a Buffalo Police employee, is unable to sue. *Id.* at 12-13. Johnson Controls further maintains there is no basis for holding Johnson Controls derivatively liable for any negligence by Avrio, an independent contractor, in installing the monitor mount. *Id.* at 13-15. Avrio does not dispute this contention.

Avrio argues in support of summary judgment against Helton that there is no evidence in the record demonstrating Avrio installed any video monitor in the

surveillance command room by mounting the monitor onto a workstation cubicle slat wall, such that Helton's negligence claim against Avrio is based on speculation which cannot defeat summary judgment.  Avrio's Memorandum at 3-5 (citing New York caselaw).  Avrio also maintains that because nothing in the record establishes Avrio installed the monitor mount on the workstation wall, or ever worked on the monitor mounted in such manner, Avrio cannot be found liable for Helton's injuries based on the doctrine of *res ipsa loquitur*.  *Id*. at 5- 9.  According to Avrio, the record is devoid of any evidence that Avrio created or had notice of a dangerous condition, and that Avrio, as a subcontractor to Johnson Controls, owed no duty of care to any alleged injured third party.  *Id*. at 10-12 (citing New York caselaw).

In opposition to both Johnson Controls' and Avrio's motions for summary judgment, Helton argues evidence in the record establishes it was Johnson Controls which decided that the NEC monitor should be placed on a mounting bracket to free up desk space at the workstation, including conversations between Captain Makowski and Johnson Controls project manager James McCarriagher.  Cooper Affidavit ¶¶ 17, 23. Helton also maintains the doctrine of *res ipsa loquitur* precludes summary judgment on the negligence issue insofar as it is unlikely the NEC monitor would have fallen from the mounting bracket in the absence of some negligence in installing the mounting bracket. *Id*. ¶ 25.

The City asserts in opposition to Johnson Controls' Motion that to avoid summary judgment in a negligence action, the City is required only "to simply establish a reasonable probability that the accident was caused by the defendant's negligence." Lee Affidavit ¶ 15.  According to the City, Defendants have merely denied knowledge as

to which defendant negligently installed the NEC monitor on the mounting bracket, which is insufficient to negate the City's *prima facie* case of negligence which is established where the facts and conditions support an inference of negligence. *Id.* The City also maintains the facts and circumstances of the incident in which Helton was injured support negligence based on *res ipsa loquitur*. *Id.* ¶ 18.

In further support of summary judgment, Johnson Controls argues the undisputed facts establish Johnson Controls had no role in mounting the NEC monitor to the mounting bracket or installing the monitor mount, Johnson Controls' Reply – Summary Judgment at 3-7; neither Helton nor the City disputes that Avrio was an independent contractor, *id.* at 7-8, Helton's *res ipsa loquitur* argument is legally and factually baseless, *id.* at 8-10; and regardless of the possibility that two or more negligent acts may contribute to the cause of an accident, in the instant case, the cause of Helton's alleged injuries is a single act of negligence, *i.e.*, the omission or incorrect installation of the end locks on the mounting bracket, for which only one party can be responsible. *Id.* at 11.

In further support of its motion for summary judgment, Avrio argues Helton relies only on speculative, conclusory, and irrelevant allegations which are insufficient to defeat summary judgment. Avrio's Reply at 5-7. According to Avrio, Helton also misrepresents some of the deposition testimony from witnesses to create the appearance of an issue of fact regarding which defendant installed the mounting bracket from which the NEC monitor slid and fell on Helton's hand. *Id.* at 7-8. Avrio argues Helton's assertion that there may be more than one contributing cause of an injury is irrelevant in the absence of any direct proof of any negligent act attributed to

Avrio. *Id.* at 8-9. Avrio maintains Helton cannot rely on the doctrine of *res ipsa loquitur* in the absence of any evidence that the NEC monitor was under Avrio's exclusive control at the time of the incident. *Id.* at 9-11. Avrio further asserts there is no basis for imposing third-party liability on Avrio. *Id.* at 11.

In further opposition to summary judgment, Helton argues deposition testimony from Johnson Controls' employees establishes Johnson Controls retained control over the manner in which the work in the surveillance command room was completed, thus creating a basis for liability as to Johnson Controls. Helton's Memorandum at 12. According to Helton, because Defendants have failed to submit evidence supporting summary judgment in their favor, Helton is not required to produce any evidence raising a triable issue of fact to defeat summary judgment. *Id.* at 13-14. Rather, Helton maintains, which Defendant negligently installed the NEC monitor on the mounting bracket presents a credibility issue that can only be resolved by the jury, who may find both Defendants – Johnson Controls and Avrio – share in the blame. *Id.* at 14-16. Finally, Helton reasserts that under the doctrine of *res ipsa loquitur*, negligence may be inferred from the known facts and circumstances of the case. *Id.* at 17-18. In its Amended Response, the City contends that any injuries Helton sustained and her medical condition prior to August 3, 2008, are irrelevant to resolving on the pending summary judgment motions the issue of liability based on the asserted negligent installation of the NEC monitor on the monitor mount. City's Response ¶ 6.

In sur-reply in further support of summary judgment, Avrio argues Helton has misrepresented the statements given by various witnesses at depositions in an attempt to create an issue of fact to avoid summary judgment, but that such statements, read in

their full context, establish only that the NEC monitor was mounted to the cubicle slat wall months before Helton's alleged injuries, such that Avrio did not have control over the monitor and cannot be held responsible for the manner in which the NEC monitor was mounted. Hunter Response Affidavit ¶¶ 21-33. Avrio emphasizes the cubicle-style workstations were provided, assembled, and installed by Wright-Line, and that Wright-Line also ordered the monitor mount.[16] *Id.* ¶ 35. According to Avrio, Helton's assertion that the Buffalo Police deny any involvement in the installation of any of the video surveillance and monitoring equipment in the surveillance command room is overly broad and conclusory and is based on the deposition testimony of only three Buffalo Police employees, including Police Officer Gwendolyn Williams, Lieutenant Ferrentino, and Captain Makowski, despite the fact that numerous Buffalo Police employees had access to the surveillance command room, *id.* ¶¶ 43-44, and nothing establishes which defendant installed the NEC monitor on the monitor mount. *Id.* ¶¶ 45-47.

In further support of summary judgment, Johnson Controls argues the undisputed facts establish Johnson Controls had no role in the installation of the monitor mount, Johnson Controls' Sur-Reply at 1-6, Plaintiffs cannot deny Avrio was an independent contractor, *id.* at 6-8; Plaintiffs' *res ipsa loquitur* argument is without legal or factual base, *id.* at 8-10; and the undisputed facts establish Helton's alleged injuries are attributed to only a single negligent act, *i.e.*, the omission of the end locks from the monitor mount's slide rail on which the NEC monitor was placed, rendering irrelevant Plaintiffs' assertions regarding more than one cause of Helton's injuries. *Id.* at 11.

---

[16] It is not clear from the record why the parties stipulated on November 17, 2012, to discontinue the instant actions against Wright-Line.

Preliminarily, the court observes that much of the evidence in the record pertains to Helton's previous on-the-job injuries and medical condition, as well as Johnson Controls' role as the general contractor in charge of the video surveillance project. It is, however, undisputed that the single issue before the court on the instant summary judgment motions filed with regard to Helton's and the City's claims is which defendant is responsible for installing the monitor mount on which was placed the NEC monitor that fell onto Helton's hand.

In particular, neither Johnson Controls nor Avrio allege Helton was comparatively negligent in attempting to adjust the NEC monitor without checking the proper placement of the end lock bolts, and it is not disputed that the NEC monitor slid off the mounting bracket either because the end lock bolts were never installed on the slide rail, or were improperly installed such that they became dislodged, allowing the NEC monitor to slide off the slide rail, landing on Helton's left hand. In support of this finding, the court relies on the deposition responses given by Plaintiffs' liability expert Saunders[17] who stated it was his opinion that the monitor mount was improperly installed because either the end locks were never installed, or were improperly installed on the slide rail, and such omission or improper installation permitted the NEC monitor, while still attached to the head assembly, to slide off the slide rail and onto Helton's hand when Helton attempted to adjust the NEC monitor. Saunders Dep. Tr. at 100-02, 104. Saunders further opined the fact that he observed, upon inspecting the monitor mount, that the bolts that served as the end locks and the square nuts that secure the

---

[17] Although Helton asserts "Saunders has been hired by both [Helton] and Defendants to perform analysis," Helton's Counterstatement ¶ 25, nothing in the record indicates either Johnson Controls or Avrio has retained Saunders as an expert. Nevertheless, whether Saunders is also retained by one or both Defendants is irrelevant as all parties may rely on Saunders deposition testimony as evidence.

bolts, *i.e.*, the "mounting hardware," were completely missing from the slide rail, and there were no "witness marks" from such mounting hardware, indicated it was unlikely the mounting hardware was ever installed on the monitor mount from which the NEC monitor fell.  *Id.* at 97, 99.   That no other cause of Helton's injuries is found in the record, and Plaintiffs do not assert any other cause such as Helton's negligence, supports the court's limiting its consideration on summary judgment to the evidence relevant to the issue of which defendant is responsible for the improper installation of the monitor mount.

Both Johnson Controls and Avrio also challenge Plaintiffs' assertion of the *res ipsa loquitur* doctrine, arguing the assertion *of res ispa loquitur*, requiring Plaintiffs prove which defendant is responsible for the negligent installation of the monitor mount, differs from the theory previously advanced by Plaintiffs, *i.e.*, actual negligence based on the omission of the end locks during installation of the monitor mount.  Johnson Controls' Reply – Summary Judgment at 8-12; Avrio's Reply at 9-11.  Defendants further maintain  the doctrine does not apply in the absence of direct evidence establishing responsibility for installing the monitor mount from which the NEC monitor fell.  *Id.*

The *res ipsa loquitur* doctrine "enables a jury presented only with circumstantial evidence to infer negligence simply from the fact that an event happened."  *St. Paul Fire & Marine Ins. Co. v. City of New York*, 907 F.2d 299, 302 (2d Cir. 1990).  The criteria for applying *res ipsa loquitur* include

> "(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff."

*Morejon v. Rais Construction Company*, 851 N.E.2d 1143, 1147 (N.Y. 2006) (quoting *Corcoran v. Banner Super Mkt.*, 227 N.E.2d 304 (N.Y. 1967)).

"When the doctrine is invoked, an inference of negligence may be drawn solely from the happening of the accident upon the theory that 'certain occurrences contain within themselves a sufficient basis for an inference of negligence.'" *Dermatossian v. New York City Transit Authority*, 492 N.E.2d 1200, 1204 (N.Y. 1986) (quoting *Foltis, Inc. v. City of New York*, 38 N.E.2d 455, 460 (N.Y. 1942)).  Although Defendants' contention that Plaintiffs' assertion of *res ipsa loquitur* represents a change in theory of liability, *res ipsa loquitur* is not a separate theory of liability but, rather, "amounts to nothing more than a common-sense application of the probative value of circumstantial evidence." *Abbott v. Page Airways*, 245 N.E.2d 388, 393 (N.Y. 1969) (citing *Galbraith v. Busch*, 196 N.E. 36, 38 (N.Y. 1935)).  Accordingly, the failure to plead *res ipsa loquitur* as a theory of liability does not render the doctrine unavailable at a later time in the action. *Estrategia Corp. v. Lafayette Commecial Condo*, 944 N.Y.S.2d 878, 878 (1st Dept. 2012) ("Plaintiffs' failure to plead the doctrine of res ipsa loquitur in the complaint does not render the doctrine unavailable at trial.  They pleaded negligence, and the circumstances warrant the doctrine's application." (citing cases)).  *Res ipsa loquitur* may also be invoked even where more than one defendant is in control provided such defendants share a common duty toward the plaintiff.  *Schroeder v. City & County Savings Bank of Albany*, 57 N.E.2d 57, 59 (N.Y. 1944) (where more than one "interdependent defendants are in control" and share a duty to another, it is for the interdependent defendants to explain their action and conduct which results in damage to another).

A careful review of the evidence submitted in support of and opposing the summary judgment motions establishes nothing connecting Johnson Controls to the installation of the NEC monitor on the monitor mount, but questions of fact exist as to Avrio's involvement, including whether Avrio installed, albeit improperly, the monitor mount.

## A.    Johnson Controls

As stated, Johnson Controls' motions for summary judgment on the issue of liability is predicated on the fact that Plaintiffs' negligence claims stem from a single allegation that the mounting bracket's end locks were either omitted or improperly installed such that, in the absence of any evidence demonstrating Johnson Controls was involved in the installation of the monitor mount from which the NEC monitor fell, Johnson Controls cannot be held liable for Helton's injuries.  Johnson Controls' Reply – Summary Judgment at 4-5.  Johnson Controls further asserts any participation by Johnson Controls' employees in decisions regarding whether to mount any of the three monitors on monitor mount is irrelevant.  *Id.*  The record is devoid of any evidence from which a reasonable jury could find that Johnson Controls participated in the installation of the monitor mount from which the NEC monitor fell.

Specifically, Helton does not know which defendant installed the subject monitor mount on the cubicle slat wall of the workstation at which Helton was sitting when she was injured on August 3, 2008.  Helton Dep. Tr.[18] at 25, 24.  Nor does Saunders have personal knowledge as to which defendant installed the monitor mount, never having

_____

[18] References to "Helton Dep. Tr." are to the pages of the transcript of the deposition of Helton, a copy of which is filed as Johnson Controls' Exh. O (Helton Action, Doc. No. 70-21).

been so advised. Saunders Dep. Tr. at 112. Buffalo Police Captain Makowski, who served as project manager for the Buffalo Police with regard to the video surveillance project, testified at his deposition that he did not observe anyone installing the monitor mount, and was without personal knowledge as to which defendant did so. Makowski Dep. Tr.[19] at 7-8, 17.

McCarriagher, who served as Johnson Controls' project manager for the video surveillance project, did not install the monitor mount but, rather, McCarriagher's "role was to ensure that the [video surveillance] Project progressed according to schedule and scope, and that Johnson Controls' customer – the City of Buffalo – was satisfied." Declaration of James McCarriagher ("McCarriagher Declaration")[20] ¶ 7. McCarriagher asserts he "did not inspect or review the details of the work performed by Avrio generally, or its installation of the monitors in the surveillance [command] room specifically." *Id.* Nor did McCarriagher "direct the manner in which Avrio performed its work on the project generally, or its work on the work-station monitors in the surveillance [command] room specifically." *Id.* Rather, McCarriager maintains that because "Avrio was a professional independent contractor hired for its expertise," McCarriagher did not wish to "interfere with the methods and means of Avrio's work," and was not always present in the surveillance command room while Avrio worked on the project. *Id.* As such, neither McCarriagher nor any other Johnson Controls employee "retained or exercised any control over the methods and means by which Avrio did its work on the [video surveillance] Project." *Id.* McCarriagher adamantly reasserts that he "did not install any monitors or monitor mounts as part of this Project,"

[19] References to "Makowski Dep. Tr." are to the pages of the transcript of the deposition of Captain Makowski, a copy of which is filed as Johnson Controls' Exh. M (Helton Action, Doc. No. 70-19).
[20] Johnson Controls' Exh. R (Helton Action, Doc. No. 70-24).

"was not involved in any actual installation," and "did not even carry tools to the job site." *Id.* ¶ 9. According to McCarriagher, the only other Johnson Controls employees who even visited the surveillance command room during its installation were a salesman and HVAC technicians who installed an HVAC unit, but who were not involved in installing the monitors. *Id.* ¶ 8. Further, the only other person affiliated with Johnson Controls was Steven Schellhammer, an independent contractor/consultant with a temporary agency, Adecco, who was neither a Johnson Controls' employee, nor involved in installing the monitors, but commenced working on the video surveillance project after the surveillance command room had been set up. *Id.* ¶ 10.

Moreover, Johnson Controls explains that it subcontracted to Avrio responsibility for the installation of the surveillance command room equipment and that pursuant to § 7.5 of the Subcontracts, Avrio assumed all responsibility for control over such installation, including of the workstations cubicles, monitor mounts, and video monitors. Johnson Controls' Memorandum – Summary Judgment at 6-7. According to Johnson Controls, there is evidence in the record suggesting that Avrio may have installed the monitor mount from which the NEC monitor fell, *id.* at 5-7, yet no evidence suggesting Johnson Controls participated in, or retained any responsibility for such installation. *Id.* Because Avrio was an independent contractor of Johnson Controls, rather than Johnson Controls' employee or agent, Johnson Controls maintains it is not liable for any negligent acts of Avrio. *Id.* at 12-14. Significantly, Avrio does not contest it was an independent contractor as set forth in § 7.5 of the Subcontracts.

As Johnson Controls posits, "[t]he general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable

for the independent contractor's negligent acts." *Kleeman v. Rheingold*, 614 N.E.2d 712, 715 (N.Y. 1993) (citing cases). This rule has been commonly justified "on the premise that one who employs an independent contractor has no right to control the manner in which the work is to be done and, thus, the risk of loss is more sensibly placed on the contractor." *Id.* Nevertheless, "a wide variety of so-called 'exceptions'" to this rule has been produced, such that "it has been observed that the general rule 'is now primarily important as a preamble to the catalog of its exceptions.'" *Id.* (quoting *Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co.*, 277 N.W. 226, 228 (Minn. 1937)). "These exceptions, most of which are derived from public policy concerns, fall roughly into three basic categories: negligence of the employer in selecting, instructing or supervising the contractor; employment for work that is especially or 'inherently' dangerous; and, finally, instances in which the employer is under a specific nondelegable duty." *Id.* (citing cases).

In the instant case, although not specifically arguing any of these three exceptions applies, Helton asserts there is evidence in the record that Johnson Controls "controlled the method and means by which the work was done in the surveillance [command] room," raising an issue of fact as to whether Avrio was an independent contractor. Helton's Memorandum at 12. Even broadly construing this argument as asserting Johnson Controls' was negligent in selecting and supervising Avrio, however, fails to avoid summary judgment in favor of Johnson Controls because the Subcontracts specifically places responsibility for the installation of the video monitor equipment on Avrio. Subcontracts § 7.5. Avrio does not argue to the contrary. Significantly, the Contract between Johnson Controls and the City does not create a non-delegable duty

to assure proper, careful installation so as to protect city employees, *i.e.*, police officers who were intended to operate the equipment in the surveillance command room, and no party argues otherwise.  Nor does any evidence in the record raise an issue of fact as to whether Avrio was unqualified to perform the work pursuant to the Subcontracts, that the installation of the video monitors and monitor mounts was inherently dangerous, or that responsibility for such installation was nondelegable.  Significantly, there is no evidence in the record that Avrio lacked the competence to install the NEC monitors in the surveillance command room, or that Johnson Controls knew, or with reasonable care should have known, about some incompetency.  *See Becker v. Poling Transportation Corporation*, 356 F.3d 381, 389 (2d Cir. 2004) (recognizing exception under New York law to general rule absolving party from liability for independent contractor's negligence where employer was negligent "in selecting, instructing, or supervising the contractor").  For that matter, the record does not remotely suggest that Avrio failed to perform, and thus breached, the Subcontracts by not installing the NEC monitor as the Subcontracts required.

That Avrio had installed similar equipment for at least one other police department, Kattel Dep. Tr. at 58, 61-62, 68,[21] and had not experienced any similar problems with monitors falling, *id.* at 100-01, is consistent with Plaintiffs' failure to challenge Avrio's qualification for the video surveillance project.  Nor does the record suggest that, despite Helton's alleged injuries, the installation of the video surveillance equipment, including the monitor mount from which the NEC monitor fell, was especially or inherently dangerous.  *Rosenberg v. Equitable Life Assurance Society of the United*

---

[21] References to "Kattel Dep. Tr." are to the pages of the deposition of Avrio employee Prasanna Kattel, filed as Johnson Controls' Exh. P (Helton Action, Doc. No. 70-22).

*States*, 595 N.E.2d 840, 843 (N.Y. 1991) (holding the inherently dangerous exception

applies only where the danger "is inherent in the nature of the contract work," rather

than in the way the work is performed). Finally, although "[t]here are not clearly defined

criteria for identifying duties that are nondelegable, . . . [t]he most often cited formulation

is that a duty will be deemed nondelegable when the responsibility is so important to the

community that the employer should not be permitted to transfer it to another."

*Kleeman*, 614 N.E.2d at 715-16 (internal citations and quotation marks omitted). The

record in the instant case is devoid of any evidence suggesting, even assuming the

video surveillance project is of great assistance to the Buffalo Police in promoting the

public's safety, that responsibility for installing the equipment in the surveillance

command room was "so important to the community" that Johnson Controls should not

have been permitted to transfer it to Avrio. There is, therefore, is no basis for finding

any of the three exceptions to the general rule that one who employs an independent

contractor is not liable for the independent contractor's negligent acts.

Insofar as Helton relies on the doctrine of *res ipsa loquitur* in support of her

negligence claim, the doctrine does not save Helton's negligence claim against Johnson

Controls in the absence of any evidence suggesting Johnson Controls participated in

the installation of the monitor mount from which the NEC monitor fell. Additionally,

although *res ipsa loquitur* may be asserted against two or more defendants, Discussion,

*supra*, at 26, here, the subcontracts specifically exclude Johnson Controls from liability

for Avrio's negligent acts. *See* Subcontracts § 7.5 (providing Johnson Controls did not

retain "any right to exercise any control over" Avrio's business or operations and no one

engaged in performing work on Avrio's behalf "shall be deemed an employee or agent

of [Johnson Controls].").  Nor, as discussed above in connection with the exceptions to the general rule that one cannot be held liable for the negligent acts of an independent contractor, can Johnson Controls be held liable for negligently subcontracting with Avrio for the installation of the surveillance command room equipment.  Discussion, *supra*, at 29-32.  No evidence in this record supports such a theory.

Furthermore, there is no basis for holding Johnson Controls liable for the design of the surveillance command room, including the selection of workstations with monitors mounted to the cubicle slat walls; rather, as Helton admits, Cooper Affidavit ¶ 13; Helton's Counterstatement ¶ 26; Helton's Memorandum at 4-5, the monitor mount was designed to accommodate video monitors weighing up to 40 lbs., and the NEC monitor that fell on Helton's hand weighed only 21.4 lbs.  Significantly, Saunders, the expert, when queried as to whether the monitor mount chosen for mounting to the workstation cubicle slat walls was an appropriate choice for placement of the NEC monitor,  and whether the NEC monitor was within the stated specifications for the monitor mount, stated he saw no problems with the mounting bracket's design, construction, installation instructions, warnings, or selection, Saunders Dep. Tr. at 88, 109, and Plaintiffs do not argue otherwise.  Rather, Saunders reaffirmed it was his "only opinion that the monitor mount at issue was improperly installed, because the end locks were either omitted or improperly installed."  *Id.* at 109-110.  Although Saunders, when pressed, explained that the only other circumstances under which the NEC monitor would have fallen onto Helton's hand included if the monitor had not been properly attached to the assembly head, or if the mounting brackets were not properly attached to the slats on the workstation cubicle slat wall, *id.* at 111, yet because the NEC monitor was still attached

to the assembly head, and the mounting brackets and slide rail remained attached to the slats on the cubicle slat wall, the only relevant explanation for the accident, according to Saunders, was that the end lock bolts were either never installed or completely omitted, allowing for the head assembly, with the NEC monitor attached, to slide off the monitor mount's slide rail. *Id.*

Because no evidence in the record suggests Johnson Controls participated in or was responsible for the installation of the monitor mount, Johnson Controls cannot be held liable for any negligence attributable to the installation of such brackets, and Johnson Controls' summary judgment motions should be GRANTED in both the Helton Action and the City Action.

## B. Avrio

In contrast to Johnson Controls' summary judgment motions, which are predicated on the complete absence of any evidence tying Johnson Controls to the installation of the monitor mount from which the NEC monitor fell, Avrio's summary judgment motion is based on conclusory and self-serving statements by Prasanna Kattel ("Kattel"), employed at times relevant to these actions as a senior consultant with Avrio, denying personal involvement in the installation of the brackets. Significantly, Kattel testified that Avrio, including Kattel and Avrio employee Randy Bognar ("Bognar"), installed all the video monitors in the surveillance command room, by removing monitors from their boxes, placing the monitors on the cubicle workstation desks, and then "powering up" the monitors to receive video from the surveillance cameras. Kattel Dep. Tr. at 23. Kattel maintains all the monitors were placed on desks

in the surveillance control room by March 2008, some of which were not immediately placed "on-line" to receive video transmission from the surveillance cameras, and Avrio continued working to complete the networking of all the video monitors in the surveillance command room with the surveillance cameras. *Id.* at 24-25. Although Kattel stated Avrio did not mount any video monitor in the surveillance command room to a "slot wall," *id.* at 25-26, and did not observe any monitor mounted to the wall, *id.* at 26, Kattel admitted having conversations with Captain Makowski regarding whether any of the video monitors should be mounted on the cubicle slat wall because mounting video monitors would free up desktop space. *Id.* at 28-29, 67-68. Kattel recalled only installing ten monitors, placing two monitor on stands on each of the five workstation's desktops provided by Wright Line, *id.* at 33, the furniture came with monitor mounts in separate boxes, but Kattel did not recall that anyone from Wright Line mounted video monitors in the surveillance command room. *Id.* at 34. Kattel did not know when the third video monitor was added to each workstation, *id.* at 39, that he was last in the surveillance command room about two weeks prior to Helton's August 3, 2008 accident, *id.* at 47, but did not recall being in the surveillance command room when all three monitors were present. *Id.* Kattel explained that his usual purpose for visiting the surveillance command room was to "see what the video looks like in the command room from the cameras as we added them." *Id.* at 50. According to Kattel, Avrio did order the backets for mounting the video mounts to the slat wall, *id.* at 42, Kattel was present when the brackets were delivered to the surveillance command room, *id.* at 43, either Kattel or Bognar opened the boxes containing the monitor mounts and brackets, *id.* at 44, and because it was Avrio's goal of uniformity among the workstations, either all the

video monitors would be placed on stands on the desktops, or on monitor mounts attached to the cubicle slat walls.  *Id*.

Kattel also exchanged e-mails with Captain Makowski regarding whether any of the video monitors should be mounted to the cubicle slat walls, or placed only on stands on the desktops, but that mounting the monitors to the wall would increase the work area of the desktops.  Kattel Dep. Tr. at 45-46.  Kattel did not know who made the decision to mount one of the video monitors to the cubicle slat wall, *id*. at 46, but admits Avrio was "in charge of the installation of the monitors in the [surveillance command] room," *id*. at 47, and any monitors delivered to the surveillance command room would "eventually" be removed from their boxes either by Kattel or Bognar under Kattel's supervision, but that Bognar would not have opened any video monitors without Kattel present.  *Id*. at 48.  Kattel speculated that perhaps someone from the Buffalo Police unpacked the third monitors when they were delivered, *id*., although no one from Avrio gave permission to anyone from the Buffalo Police to install any of the video monitors, and Captain Makowski never state such work had been performed by any Buffalo Police employee.  *Id*. at 48-49.

Kattel asserted he chose the monitors used in the surveillance command room, including two Dells and an NEC monitor, Kattel Dep. Tr. at 57, which is in contrast to Kattel's statement that Avrio installed only two monitors on each cubicle workstation's desktop.  Further, Kattel stated Avrio had installed the same model NEC monitor on the same model Wright Line video mount for a video surveillance project for the St. Paul, Minnesota, police department, so Kattel had no concerns as to whether the NEC monitor was too heavy to install on a video mount.  *Id*. at 58.  Kattel agreed it was

possible Avrio ordered the video mounts from Wright Line, but that if he observed anyone from the Buffalo Police attempting to install a video monitor, he would instruct such person not to do so. *Id.* at 61-62.

There are several inconsistencies in Kattel's deposition testimony begging the critical question of Avrio's involvement in installing the NEC monitor on the monitor mount. Specifically, Kattel inconsistently states only two monitors were installed at each workstation, Kattel Dep. Tr. at 33, yet later testified that he was involved in selecting all three monitors to be installed at each workstation, including two Dell monitors and the NEC touchscreen monitor. *Id.* at 58. Kattel's insistence that he would not have allowed anyone other than an Avrio employee to install any of the video monitors at the workstations also sidesteps the question as to why, upon observing a third video monitor had been installed at each workstation, neither Kattel, nor another Avrio employee, attempted to discover the party responsible for installing the third video monitor to inspect the installation to determine whether it was proper.

Moreover, Kattel testified near the end of his deposition that initially, two monitors were ordered for and installed at each of the cubicle workstations, including a 21-inch Dell and a heavier, 24-inch NEC touch screen, both of which were placed on the workstations' desktops on stands, the Dell on the right and the NEC on the left. Kattel Dep. Tr. at 95-98, 112. Later, Captain Makowski decided to add a smaller, 19-inch Dell monitor, which were ordered for each workstation to aid with dispatching 911 calls. *Id.* at 97-98, 109-10, 112-13. Significantly, Kattel stated,

> Captain Makowski wanted to add a third monitor. And then he [Captain Makowski] gave a PO [purchase order] to JCI [Johnson Controls] and JCI came to us and gave us the PO *and then we went ahead and installed them.*

Kattel Dep. Tr. at 112-13 (italics added).

Kattel thus admitted installing a third monitor, in direct contrast to Kattel's earlier assertion during his deposition that Avrio only installed two monitors at each workstation. The record thus demonstrates the existence of material issues of fact as to the extent of Avrio's involvement in installing the video monitors, including, specifically, the NEC monitor on the monitor mount and the end locks on the slide rail, precluding summary judgment in favor of Avrio.

To be sure, the evidence in the record raises questions as to whether Avrio actually installed the monitor mount in question and, even if Avrio did install the monitor mount, whether the installation was negligent because the end locks either were omitted or were improperly installed, or whether someone else later removed or loosened the end locks. Further, questions of fact remain as to whether Avrio installed the third monitor on a stand on the workstation desktop, or on the monitor mount, or if the NEC monitor was later moved from the desktop stand to the monitor mount by an Avrio employee or someone else. Such questions of fact regarding whether Avrio is responsible for the installation of the monitor mount, including the omission or improper installation of end locks on the monitor mount's slide rail, thus preclude summary judgment in Avrio's favor on Avrio's motion for summary judgment which should be DENIED.

**3.      Cross-Claim Against Avrio**

Johnson Controls also moves in both actions for partial summary judgment on its

crossclaim against Avrio alleging Avrio breached its contractual obligation under the subcontracts to obtain and maintain a CGLI policy providing for at least $ 3 million coverage per occurrence and in the aggregate, and naming Johnson Controls as an additional insured. Avrio has not argued in opposition to the motion, and Johnson Controls asserts such failure to respond establishes Avrio has conceded that Johnson Controls is entitled to partial summary judgment on this claim. Johnson Controls' Reply – Partial Summary Judgment at 2.

A plain reading of the Subcontracts, as quoted by Johnson Controls, establishes Avrio was required to obtain and maintain a Commercial General Liability Insurance policy ("CGLI policy") with $ 3 million per occurrence and general aggregate limits, and to name Johnson Controls as an additional insured. Subcontracts ¶¶ 5.1. Avrio does not deny Johnson Controls' assertion, Johnson Controls Memorandum – Partial Summary Judgment at 2, that Avrio breached the Subcontracts by failing to name Johnson Controls as an additional insured on its CGLI policy, and only obtained insurance coverage of $ 1 million bodily injury coverage per occurrence, with a $ 2 million aggregate.

Under New York law, the elements of a breach of contract claim include (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other party; (4) resulting in damages. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). In the instant case, Johnson Controls asserts, and Avrio does not dispute, that the Subcontracts are valid contracts, Johnson Controls' Memorandum – Partial Summary Judgment at 2; that Johnson Controls performed its duties under the Subcontracts, *id.* at 3; that Avrio breached its duty to

obtain the requisite amount of insurance and, as particularly relevant to the question of Johnson Controls' damages, to name Johnson Controls as an additional insured, *id.* at 3; as a result of which Johnson Controls has incurred damages, including the expenditure of attorneys' fees defending the Helton Action and the City Action that Johnson Controls otherwise, as an additional insured entitled to a defense of the Helton Action, would have been covered by the insurance policy Avrio was required to obtain. *Id.* at 2. Accordingly, Johnson Controls has established all four elements of its unopposed breach of contract crossclaim against Avrio.

Johnson Controls' motion for partial summary judgment on its breach of contract crossclaim against Avrio should be GRANTED.

## **CONCLUSION**

Based on the following, Defendant Johnson Controls' Motions for Summary Judgment (Helton Action, Doc. No. 70; City Action, Doc. No. 28) should be GRANTED; Defendant Johnson Controls' Motions for Partial Summary Judgment (Helton Action, Doc. No. 72; City Action, Doc. No. 29) should be GRANTED; Defendant Avrio's Motion for Summary Judgment (Helton Action, Doc. No. 71) should be DENIED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     November 6, 2013
           Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

*/s/ Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       November 6, 2013
            Buffalo, New York